**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

ANDREW MAIDEN,                    )
                                  )
            Plaintiff,            )
                                  )
      v.                          )    Cause No. 3:14-cv-901
                                  )
AETNA LIFE INSURANCE COMPANY      )
and EVONIK CORPORATION LONG       )
TERM DISABILITY GROUP POLICY,     )
                                  )
            Defendants.           )

## OPINION AND ORDER

Andrew Maiden was a lab technician for Evonik Corporation for twenty-five

years when he allegedly became disabled by physical and mental health issues. As an

employee, Maiden was covered by Evonik's Long Term Disability Group Policy, which

guaranteed long term disability benefits and waiver of life insurance premium benefits

if an employee became disabled. (*See generally* DE 27-12; DE 27-9 at 35–89.[1]) Maiden

applied for benefits, but Aetna Life Insurance Company denied his claim and a

subsequent appeal. Maiden brought this case against Aetna and the plan under the

Employee Retirement Income Security Act, challenging Aetna's decision. The matter is

before me on cross motions for summary judgment.

### Background

In September 2012, Mr. Maiden alleges that he was forced to stop working as a

---

[1]      Pin cites are to the page numbers assigned by the CM/ECF system.

lab technician for Evonik due to the debilitating effects of spinal stenosis, arthritis, diabetes, sleep apnea, and bipolar disorder. A few months later, in early 2013, Maiden applied for long term disability ("LTD") benefits under the plan, which provided the following test of disability:

> In the first 24 months of your disability you meet the test of disability on any day that:
> •       You cannot perform the material duties of your own occupation solely because of an illness, injury or disabling pregnancy-related [sic]; and
> •       Your work earnings are 80% or less of your adjusted predisability earnings.

(DE 27-8 at 95–96; DE 27-3 at 20; DE 27-12 at 8.)

On May 30, 2013, after reviewing information submitted by Maiden and his health care providers, Aetna denied Maiden's LTD claim. (DE 27-3 at 30–32.) In the denial letter, Aetna said it had reviewed Maiden's "claim for both a physical and mental health impairment" but that "the medical records we have received at this time . . . do not support your claim of impairment from a physical or mental health condition(s)." (*Id.* at 31.) The letter stated that Maiden's medical records regarding his physical health "did not . . . provide any diagnostic testing that would support your claim of impairment" or "provide any restrictions or limitations to support your claim[.]" (*Id.*) It also indicated that mental health records Maiden submitted did not "support an impairment due to a mental health condition[,]" in part because Maiden's therapist stated that Maiden's "disability was due to a physical condition." (*Id.*) Finally, the letter listed examples of additional materials Maiden might submit to support his claim. (*Id.*)

Maiden then began submitting additional medical records and other support from his doctors and his mental health service providers. Aetna reviewed the materials on a rolling basis and periodically notified Maiden that his LTD claim remained denied —first in a letter on July 10, 2013 (*see* DE 27-3 at 34–35), then again on September 16, 2013 (DE 27-3 at 36–37), and finally, on October 18, 2013 (DE 27-3 at 54–55). Each of these three subsequent letters from Aetna gave the same list of additional support Maiden might submit as the initial letter, modified to include information about psychological issues (additions shown below in *italics*):

- a detailed narrative report for the period of 9/12/2012 through present, outlining [the] specific physical and/or mental limitations & restrictions inherent to your condition which your doctor has placed on you as far as gainful activity is concerned, *specifically, cognitive impairments along with exam findings that substantiate that you are cognitively impaired;*
- physician's prognosis including current course of treatment, frequency of visits, specific medications prescribed;
- copies of diagnostic studies . . . such as MRI, CT, or EMG/NCS that would correlate with your symptoms of thoracic back pain, *and/or specific symptoms associated with the diagnosis of Bipolar Disorder . . . [such as] mood lability, pressured speech, psychomotor impairments, or poor concentration. Any other behavioral impairments that would preclude work could also be submitted;*
- any documents or information specific to the condition(s) for which you are claiming total disability, and which would assist in the evaluation of your disability status;
- any other information or documentation you believe may assist us in reviewing your claim.

(*Id.* at 35, 37, 55 (emphasis added); *see also id.* at 31.)

The July 2013, September 2013, and October 2013 letters did not specify whether

the additional records submitted by Maiden had resolved any of the shortcomings identified by Aetna or specify why Maiden's evidence continued to be insufficient. (*Id.* at 34–37, 54–55.) Instead, they merely stated that "[a]lthough you have provided additional medical documentation for consideration of LTD benefits, this information does not support you [sic] are disabled and your claim remains terminated." (*Id.* at 34–37, 54–55.)

Maiden appealed Aetna's denial, and, although the record is not perfectly clear, at a minimum, it appears that Maiden submitted records from his primary care physician (Dr. Becker), a therapist (Dr. DeVault), a pain management specialist (Dr. Siddiqui), a neurologist (Dr. Reibold), a surgeon (Dr. Gorup), and a psychiatrist (Dr. Buonanno), in support of his appeal. (*See generally* DE 27-7 at 38–39.)

In response, Aetna provided Maiden's file to two "independent" consultants. (*See* DE 27-3 at 87–92, 95–99.) I put quotations marks around the word "independent" because one might reasonably wonder just how independent the reviewers — Dr. Malcolm McPhee and Dr. Leonard Schnur — really are. Their bread has been buttered by Aetna before; each of them has been hired by Aetna multiple times to conduct these kinds of disability reviews. *See, e.g., Pearson-Rhoads v. Aetna Life Ins. Co.*, 2011 WL 5116633, at *9 (E.D. Penn. Oct. 28, 2011); *Flatt v. Aetna Life Ins. Co.*, 2015 WL 5944365, at *10–11 (W.D. Tenn. Oct. 13, 2015); *see also Aschermann v. Aetna Life Ins. Co.*, 2011 WL 6888840, at *10 (S.D. Ind. Dec. 30, 2011); *Barrett v. Aetna Life Ins. Co.*, 2012 WL 2577505, at *3 (W.D. Ky. July 3, 2012); *Wiggin v. Aetna Life Ins. Co.*, 2013 WL 6198181, at

*6 (D. Maine Nov. 27, 2013); *Hulst v. Aetna Life Ins. Co.*, 2014 WL 4594528, at *7 n. 4 (E.D.

Ky. Sept. 15, 2014); *Rall v. Aetna Life Ins. Co.*, 565 Fed. App'x 753, 756 (10th Cir. 2014);

*Hammonds v. Aetna Life Ins. Co.*, 2015 WL 1299515, at *8 (S.D. Ohio Mar. 23, 2015); *Carrier

v. Aetna Life Ins. Co.*, 2015 WL 4511620, at * 7 (C.D. Cal. July 24, 2015); *Jalowiec v. Aetna

Life Ins. Co.*, 2015 WL 9294269, at *10 (D. Minn. Dec. 21, 2015).

Dr. McPhee, Aetna's physician consultant, analyzed Maiden's physical

complaints and concluded that Maiden's "thoracic degenerative spine condition would

not explain his lower back and mid back pain since a motor vehicle [accident] on

2/03/2009" and that "[r]easonable restrictions and limitations . . . would be lift/carry 10

pounds frequently and up to 20 pounds occasionally, stand/walk . . . on a frequent

basis, crouch/squat, bend could be performed occasionally, sitting could be on a[]

frequent basis, hand use would be unrestricted." (DE 27-3 at 90.) Dr. Schnur, the

psychological consultant, concluded that Maiden's records "did not . . . include a

sufficient range of formal measurements of cognitive and emotional functioning to

accurately substantiate the presence of an ongoing functional impairment of a

psychological nature." (*Id.* at 98–99.)

On April 2, 2014, Aetna informed Maiden that it had completed its final review

and had upheld its denial of Maiden's LTD claim. (*Id.* at 68–70.) In this final letter,

Aetna—for the first time—identified the following shortcomings in Maiden's evidence:

> Reports indicate that the thoracic degenerative spine condition
> would not explain Mr. Maiden's level of lower back and mid
> back pain since a motor vehicle accident on February 03, 2009.

Dr. John Fiederlein on September 13, 2013 described the degenerative thoracic changes on the report as mild degenerative changes similar to a previous study of September 06, 2012; there were no clinical neurological findings. . . .

There were no formal measurements of cognitive emotional functioning to substantiate claims by Dr. Becker that Maiden was on pain medication for a back injury and pain might affect his concentration and attention[.]

[T]he documentation did not include formal measurements of cognitive and emotional functioning to substantiate the presence of an ongoing functional impairment of a psychological nature.

(*Id.*) Maiden filed this suit a week later, seeking judicial review under the Employee Retirement Income Security Act ("ERISA"), 20 U.S.C. §§ 1001 et seq. (DE 1.)

### *Waiver of Life Insurance Premium Benefits*

Maiden applied for waiver of life insurance premium ("LWOP") benefits in early 2013. (See DE 27-9 at 2–3.) The LWOP policy provided its own definition of "disabled":

You will be considered permanently and totally disabled under this plan if disease or injury prevents you from:
• Working at your own job or profession or any other job or profession for pay or profit; and
• Being able to work at any reasonable job or profession. A "reasonable job" is any job for pay or profit which you are, or may reasonably become, qualified for by education, training, or experience.

(DE 27-9 at 43.) Aetna's initial review of Maiden's LWOP claim was comprised of a file review by an Aetna-employed nurse. (*See generally id.* at 30–33.) The nurse's written report summarized the evidence and noted that Maiden's claim for LTD benefits had been denied for lack of support "from both [a] medical and psychological perspective."

(*Id.* at 33.) The report also noted that Maiden's psychiatrist felt he could work part-time and concluded that, although Maiden's psychologist found him unable to work due to combined physical and psychological problems, "the exam findings in the progress notes provided were unable to support severity of [his] psychological condition." (*Id.* at 32–33.) The report did not discuss whether Maiden was "able to work at any reasonable job or profession" other than his own. (*Id.* at 30–33.)

Aetna denied Maiden's LWOP claim on August 22, 2013, stating that "the information in [the] file was unable to support preclusion from working at any occupation" and informing Maiden that Aetna would review "any additional information, not previously submitted, which you believe will assist us in evaluating your claim[.]" (*Id.* at 95.) Maiden appealed the LWOP denial on February 10, 2014, providing the same materials he had submitted with his LTD appeal. (DE 27-9 at 198–99.) It's unclear from the record how Aetna conducted its internal review, but defendants' briefing states that Aetna ultimately affirmed the denial of LWOP benefits on the basis of Aetna's denial of Maiden's LTD claim. (*See* DE 27 at 23.)

## Discussion

This matter is before me on cross motions for summary judgment. Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In reviewing cross-motions for summary judgment, a court must apply this standard to both motions and view all facts and draw all reasonable inferences in the

light most favorable to the party opposing each motion. *Tate v. Long Term Disability Plan for Salaried Emps. of Champion Int'l Corp. #506*, 545 F.3d 555, 559 (7th Cir. 2008).

When reviewing the denial of a claim for benefits by an ERISA administrator, courts apply a de novo standard "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). In the 25 years since *Firestone* was decided, most plans have gotten the hint and gone ahead and given the administrator discretionary authority to determine when benefits are to be paid. The plan here is no different. Aetna has the discretionary authority to determine whether and to what extent eligible employees and beneficiaries are entitled to benefits. (DE 27-12 at 67 ("We shall have discretionary authority to determine whether and to what extent eligible employees and beneficiaries are entitled to benefits and to construe any disputed or doubtful terms under this Policy[.]").) As a result, my review of Aetna's denial of LTD and LWOP benefits is under the arbitrary and capricious standard. *See Jenkins v. Price Waterhouse Long Term Disability Plan*, 564 F.3d 856, 861 (7th Cir. 2009).

The arbitrary and capricious standard requires only rational support in the record, but it "is not a euphemism for a rubber-stamp." *Majeski v. Metro. Life Ins. Co.*, 590 F.3d 478, 483–84 (7th Cir. 2009). Where, like here, the ERISA administrator has both the discretionary authority to determine benefits eligibility and is obligated to pay any benefits awarded, courts should weigh the structural conflict of interest as a factor. *See Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 115 (2008); *see also Holmstrom v. Metro. Life Ins.*

8

*Co.*, 615 F.3d 758, 766 (7th Cir. 2010) ("An administrator's conflict is a key consideration under this deferential standard.").

### Defendants' Motion to Dismiss the Plan

Although it is just a distraction, there is an initial matter to sort out over whether the plan is an unnecessary party and should be dismissed, as the defendants request. (*See* DE 27 at 23.) Defendants concede that "[h]istorically, the law in the Seventh Circuit required suit to be brought against the benefit plan" but claim the Seventh Circuit's opinion in *Larson v. United Health. Ins. Co.*, 723 F.3d 905, 915–16 (7th Cir. 2013) renders the plan an improper party here. I disagree. The general rule is that the plan is the only appropriate party. *See Blickenstaff v. R.R. Donnelley & Sons Co. Short Term Dis. Plan*, 378F.3d 669, 674 (7th Cir. 2004) (citations omitted); *see also Neuma, Inc. v. AMP, Inc.*, 259 F.3d 864, 872 n.4 (7th Cir. 2001) ("We continually have noted that ERISA permits suits to recover benefits only against the Plan as an entity."). In *Larson*, the plaintiff did not sue the plan and instead named only the insurer as a defendant. 723 F.3d at 908. The Seventh Circuit held that the insurer is a proper defendant under § 1132 (a)(1)(B), "where the plaintiff alleges that she is a participant or beneficiary under an insurance-based ERISA plan and the insurance company decides all eligibility questions and owes the benefits[.]" *Id.* at 915. The question of whether the plan was a proper party was not raised in *Larson*, and, thus, *Larson* does not limit the right of a participant like Maiden to sue the plan under 29 U.S.C. § 1132. *See generally id.* at 675; *see also* 29 U.S.C. § 1132 (d) ("An employee benefit plan may sue or be sued under this subchapter as an

9

entity."). Accordingly, defendants' motion to dismiss the plan is denied.

### *Aetna's Notices of Denial of LTD Benefits*

As noted above, Aetna sent four letters regarding its denial of Maiden's LTD claim before it finally denied the claim in April 2014. (*See* DE 27-3 at 30-37, 54-55.) Maiden argues that Aetna did not sufficiently explain why it ignored or discounted medical evidence he submitted in support of his claim, and I take this to be a criticism of Aetna's notifications of the denial. (*See* DE 29 at 25–26.) Under ERISA, administrators must notify participants of claim denials in writing and "in a manner calculated to be understood by the participant" and give those whose claims have been denied "a reasonable opportunity . . . for a full and fair review." 29 U.S.C. § 1133. The initial claim denial must: (1) include the specific reasons for the denial; (2) specifically refer to the pertinent plan provisions on which the denial was based; (3) describe additional materials or information needed to perfect the claim and explain why such information is necessary; and (4) provide the internal appeal procedures and state that the participant has a right to bring a civil action if the denial is affirmed after internal review. *Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 689 (7th Cir. 1992); *see also* 29 C.F.R. § 2560.503-1(g). A "blanket request for 'additional medical information'" will not do the job of describing "additional material or information necessary to perfect the claim[.]" *Halpin,* 962 F.2d at 691 (quoting and citing *Wolfe v. J.C. Penney, Inc.*, 710 F.2d 388, 393 (7th Cir. 1983)).

But a notification of claim denial does not need to be perfect and instead must

only substantially comply with the regulations. *See Schneider v. Sentry Group Long Term Disability Plan*, 422 F.3d 621, 628–29 (7th Cir. 2005) (finding a notice of denial not in substantial compliance because it did not set out the specific reasons for termination of benefits, did not identify relevant plan provisions, and did not describe additional materials needed to perfect the claim or the plan's review procedures); *see also Wolfe,* 710 F.2d at 392–93. In assessing whether a denial notice substantially complies with the regulations, courts should "remember . . . the purpose of the regulations:  to afford the beneficiary and the courts a sufficiently precise understanding of the ground for the denial to permit a realistic possibility of review, even under a deferential standard." *Halpin*, 962 F.2d at 694.

In my view, Aetna's notices to Maiden did not substantially comply with ERISA's disclosure requirements. The May 2013 letter informed Maiden that his LTD claim was denied because "we do not have medical information to support your claim of disability or that you are under the care of a physician as required by your policy." (DE 27-3 at 31.) To begin with, the letter did not include the required reference to the provisions of the plan requiring claimants to be under a doctor's care. (*See id.* at 31–32.) What's more, the initial letter failed to substantially comply with the regulations because it did not describe additional information needed to perfect the claim and explain why that information was necessary. (*Id.*) For example, the May 2013 letter indicated that Aetna had reviewed the claim for a mental health impairment and found the "information received did not support an impairment," but it did not describe

additional information Maiden should submit about his mental health issues or explain why that information was necessary. (DE 27-3 at 31.) The letter also did not ask Maiden to submit records from neurosurgeons and pain management specialists or inform Maiden these "records should include any diagnostic reports as well as office treatment notes with documentation of exam findings, spinal rom [range of motion], response to treatment, and treatment plan to better understand . . . functional capacity and prognosis"—even though these deficiencies and recommendations appeared in Aetna's internal documentation. (*Compare* DE 27-2 at 47 *and* DE 27-11 at 7–8 (Aetna documentation dated May 2013 discussing need for pain management records), *with* DE 27-3 at 30–32.)

Of course, the May 2013 letter was not the only one Aetna sent to Maiden. *See Halpin*, 962 F.2d at 693 (considering later letters for the sake of argument even though the "regulations require that the denial letter itself contain specific reasons"). Aetna's later letters, sent in July 2013, September 2013, and October 2013 were slightly more complete in that they specified additional mental health records Maiden could provide to perfect the claim. (*See* DE 27-3 at 35, 37, 55; *see also supra* at 3 (showing differences between the initial denial and later letters).) But aside from new requests for documentation of psychological issues, these later letters provided no additional detail about deficiencies in Maiden's file. (*See id.* at 35, 37, 55 (stating "[a]lthough you have provided additional medical documentation for consideration of LTD benefits, this information does not support you [sic] are disabled and your claim remains

terminated").) Like the May 2013 letter, these later letters failed to state that Maiden should submit records from neurosurgeons and pain management specialists, and they gave Maiden no sense of why the additional records he had already submitted were not good enough. (*See generally id.* at 34–37, 54–55.)

The shortcomings in Aetna's pre-appeal letters could have left—and apparently did leave—significant gaps in Maiden's understanding of what information was needed to perfect his claim. In September 2013, after Aetna had already sent three letters to Maiden, he contacted Aetna to request clarification. (DE 27-11 at 1.) During a phone conversation with an Aetna representative, Maiden "appeared confused" and requested "a specific list of what medical information [is] need[ed] to review his claim."(*Id.*) Maiden also asked for an explanation of Aetna's request for a "detailed narrative from a physician" because he had already submitted three narratives and had not been told by Aetna why they were insufficient. (*See id.*) The Aetna representative who spoke with Maiden "wasn't sure what to tell him" and asked someone else to return the call. (*Id.*)

It is unclear from the record whether Aetna called Maiden back, but it doesn't really matter because Aetna was required to give Maiden adequate information about what Aetna had reviewed and what evidence it viewed as needed but missing *in writing*. While Aetna's April 2014 letter laid out in more detail than ever the reasons for Aetna's denial of the claim, it came too late in the game to afford Maiden a full and fair opportunity for review. (*See* DE 27-3 at 68–70.) And that's what the regulations require: that claimants have an opportunity for a full and fair review of claim denials by "an

13

appropriate named fiduciary of the plan." *See* 29 C.F.R. § 2560.503-1(h). The problem in this case is that the letter was issued *after* Aetna had completed its internal review (DE 27-3 at 68–70), and Maiden was not given an opportunity to address it prior to Aetna's final denial. *See Halpin*, 962 F.2d at 694 (affirming entry of summary judgment for claimant where administrator's correspondence contained "nothing . . . which in any adequate way identified the items considered by the administrator" and did not provide "adequate disclosure of reasons for the initial denial").

Aetna's failure to provide Maiden with adequate information about why his claim had been denied *before* Aetna's internal review prevented Maiden from receiving a full and fair opportunity for review by Aetna. For this reason alone, Maiden is entitled to summary judgment.

### *Compound Effect of Maiden's Physical and Psychological Problems*

There are other problems with how Aetna went about its work here. Chief among them is Aetna's failure to consider the compound effect of Maiden's physical and psychological problems on his ability to work. From the beginning, Maiden's claim for LTD benefits was based on multiple conditions, including (a) "severe back pain and the medications to prevent it" and (b) bipolar disorder. (*See* DE 27-8 at 95 (also listing hypertension, chronic obstructive pulmonary disease, sleep apnea, and diabetes).) In addition, the records submitted by Maiden's treating providers noted the interplay of his physical and psychological problems. For example, Dr. Akey, a psychologist who saw Maiden several times at the request of his regular therapist, stated "based on my

assessment of his psychological functioning on our most recent contact . . . I believed that his physical and psychological problems had combined such that he was not able to utilize the concentration, persistence, and precision required in his job." (DE 27-8 at 85.) On another occasion Dr. Akey noted that Maiden's "multiple chronic medical conditions had combined with the acute unresolved problem of pain . . . such that his capacity to sustain adaptive functioning on the job was overwhelmed." (DE 27-8 at 94.) Dr. DeVault, Maiden's regular therapist, also noted that "throughout the course of therapy Mr. Maiden has significant mental and medical issues which make it too difficult to work." (DE 27–8 at 6.) There's more. Dr. Donaldson, a neurosurgeon to whom Maiden was referred for back pain, similarly noted the effect of Maiden's psychological impairments on treatment options. (DE 27-8 at 80.) In particular, in a letter to another doctor, Dr. Donaldson said that a spine stimulator was contemplated for Maiden, but the idea was discarded because of Maiden's "psychiatric issues currently." (*Id.*)

While Aetna said it reviewed Maiden's "claim for both a physical and mental health impairment," the record shows that Aetna assessed Maiden's ability to work in silos, considering whether Maiden's back pain rendered him disabled under the plan separate and apart from whether psychological problems did. Aetna's approach is most obvious in the reports drafted by Aetna's reviewers during Maiden's internal appeal. (*See generally* DE 27-3 at 87–92, 95–99.) Dr. McPhee, the physician consultant Aetna hired, was asked to focus "on the effect that any physical conditions would have on

[Maiden's] function for the time period from 9/12/2012 to 03/29/2014." (*Id.* at 90.) He noted that Maiden had "been under psychiatric care for many years" and that "psychiatric conditions affect an individual's reaction to physical symptoms[,]" but nothing in Dr. McPhee's report suggests that he consulted with Dr. Schnur, Aetna's other reviewer, regarding the combined effect of Maiden's medical and psychological impairments. (*Id.*)

Similarly, Dr. Schnur, the psychologist Aetna hired to review Maiden's records, was asked to determine whether Maiden "has a psychological impairment which would preclude [him] from performing the work of his 'own occupation' for the time period 9/12/12 through 3/29/14." (*Id.* at 97.) Dr. Schnur's report stated that the majority of information submitted pertained to Maiden's physical health but gave no indication that Dr. Schnur consulted Dr. McPhee to determine Maiden's overall well-being. (*Id.*) Indeed, Dr. Schnur made it clear that such an assessment was "beyond the scope of (his) expertise" and needed to be assessed by other reviewers. (*Id.*)

Whether Maiden's health concerns satisfy the plan's definition of "disability" or not, they are comprised at a minimum of back pain and psychological impairments, and nothing in the plan justified Aetna's consideration of these co-morbidities in isolation. (*See generally* DE 27-12 at 8 (defining disability).) Aetna should have reviewed the compound effect of Maiden's physical impairments and his psychiatric issues, and its failure to do so was an arbitrary and capricious exercise of Aetna's discretion. *Compare generally Kirkpatrick v. Liberty Mut. Group, Inc.*, 856 F.Supp. 2d 977, 999 (S.D. Ind. 2012)

(granting summary judgment to claimant where the plan "failed to consider relevant aspects of [the claimant's] medical condition" and directing the plan to "ensure it considers and addresses [claimant's] physical condition as a whole" on remand).)

### *Aetna's Assessment of the Evidence*

Even within the silos of physical versus psychological disabilities, Aetna's review of Maiden's file is troubling. Aetna argues that there was substantial evidence upon which to base its denial and cites to the written reports of its consulting reviewers. (DE 32 at 13–17; DE 27 at 12–21.) Maiden disagrees and claims that Aetna improperly gave more weight to its own reviewers, unfairly discredited Maiden's supporting evidence, and cherry-picked evidence to support its denial of Maiden's claim. (DE 29 at 26–29; DE 33 at 14–15.) Because both of Aetna's consultants essentially rejected the opinions of Maiden's treating physicians, the question is whether they provided "a reasoned basis" for doing so. *See Holmstrom*, 615 F.3d at 775 ("Administrators may not arbitrarily refuse to credit [the] opinions of a treating physician" but are entitled to disagree with such opinions "if there [is] evidence in the record providing a reasoned basis for doing so."); *Love v. Nat'l City Corp. Welfare Benefits Plan*, 574 F.3d 392, 398 (7th Cir. 2009) ("While plan administrators do not owe any special deference to the opinions of treating physicians, they may not simply ignore their medical conclusions or dismiss those conclusions without explanation.").

In addition, as I alluded to above, Dr. McPhee and Dr. Schnur's relationship with Aetna is not immaterial to my analysis here. A consultant "hired by the administrator

. . . may have a financial incentive to be hard-nosed in his claims evaluation in order to protect the financial integrity of the plan." *Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 917 (7th Cir. 2003). If a treating physician and a plan's consultant are assumed to have equal and opposite incentives, then "consideration of the incentives drops out and the superior information is likely to be possessed by the treating physician, especially when . . . the consultant does not bother to examine the patient." *Id.* Dr. McPhee and Dr. Schnur appear to have an ongoing consulting relationship with Aetna (*see supra* at 4–5), and there is no dispute that they based their opinions entirely on the record evidence.

### 1. *Back Pain Evidence*

In its April 2014 letter, Aetna summarized Maiden's evidence related to back pain and identified shortcomings that led Aetna to affirm its denial of Maiden's claim. Specifically, Aetna noted that "mild degenerative thoracic changes" shown on an MRI in September 2013 were described by one doctor as "similar" to those on a September 2012 MRI, claimed that "there were no clinical neurological findings," and concluded that "the thoracic degenerative spine condition would not explain Mr. Maiden's level of lower back and mid back pain." (DE 27-3 at 69.) These criticisms mirror those identified by Dr. McPhee, Aetna's consulting physician, in the report he wrote documenting his reivew of Maiden's records. (*Compare id., with* DE 27-3 at 90.) In addition, they are the only reasons provided by Aetna for its decision that the restrictions on Maiden's physical activity by his primary care physician were "not supported by the file

information." (*Id.*; *see also* DE 27-3 at 69 (Aetna's finding that reasonable restrictions and limitations for Maiden would be to "lift/carry 10 pounds frequently and up to 20 pounds occasionally, stand/walk . . . on a frequent basis, crouch/squat, bend . . . occasionally, sitting on a frequent basis, [and] hand use would be unrestricted"), *with* DE 27-4 at 2 (documentation from Maiden's primary care physician limiting Maiden to sedentary work).)

But similarities between MRIs of Maiden's back taken in 2012 and 2013 and the purported lack of "clinical neurological findings" here can hardly be called a "reasoned basis" for Aetna's decision. At a minimum, this is another example of Aetna's failure to specify what was needed to perfect the claim because it does not explain what sort of clinical neurological findings were needed and/or why the information Maiden had already submitted were not good enough. Even if it were perfectly clear what counts as "clinical neurological findings," it misapprehends Maiden's claim and inexplicably disregards the record that Aetna had before it. Maiden's claim is that his back pain (together with other problems) was already permanently disabling by September 2012 when he stopped working, so there was no basis for Aetna to require a showing that Maiden's degenerative thoracic spine condition had worsened between 2012 and 2013. Further, the MRIs taken of Maiden's back in September 2012 showed "a mild focal central disc herniation at T7-T8," "a mild right sided disc bulge at T9-T10 with mild flattening of the right anterior cord and mild spinal stenosis," and "bilateral facet ligamentous hypertrophy at T10-T11 with moderate spinal stenosis," and an MRI in

October 2012 showed "[b]ridging anterior osteophytes . . . at multiple levels in the lower thoracic spine." (DE 27-6 at 98; DE 27-7 at 1.) It is unclear from the record how Aetna viewed this evidence and/or why Aetna decided to disregard it.

In addition, the MRI evidence Maiden submitted was just one piece of a large puzzle of information about Maiden's back pain. (*See generally* DE 29 at ¶¶ 36, 38, 43–44, 47, 49, 52, 54, 57–58, 60–67, 69–70, 73–76 (summarizing evidence.).) When Maiden's physician examined him in September 2012, she noted decreased lumbar mobility, paravertebral muscle spasm, bilateral thoracic tenderness, and bilateral lumbosacral tenderness and recommended him for a neurosurgery consult. (DE 27-6 at 92.) Maiden also submitted records from numerous specialists who examined him and found him to have significant back pain. Dr. Siddiqui, a pain management specialist to whom one of Maiden's neurologists referred him, reported that he was able to reproduce Maiden's mid-back pain by "[e]xtension and lateral bending, facet loading" and that Maiden's back pain was reproduced by "[p]alpation of thoracic facet joints at T9-10, T10-11, T11-12 levels" and found "[t]he evidence for the diagnosis of thoracic facet joint pain with controlled comparative local" at a "Level I." (DE 27-6 at 18–19; *see also* DE 27-6 at 14 (finding on October 28, 2013 "evidence for the diagnosis of thoracic facet joint pain with controlled comparative local is Level I or II-1 based on the USPSTF criteria").)

While Aetna felt that a "thoracic degenerative spine condition would not explain Mr. Maiden's level of lower back and mid back pain[,]" Dr. Siddiqui had a different opinion and found that Maiden's back pain was of a "*well-documented* thoracic facet

joints origin as evidenced by successful response to two separate sets of diagnostic medial branch nerve blocks[.]" (*Compare* DE 27-3 at 69, *with* DE 27-6 at 10–11 (emphasis added).) Dr. Siddiqui, like other providers treating Maiden, found Maiden eligible for diagnostic procedures and treatment that would make no sense if Maiden's pain were insignificant or were not caused by a problem in the thoracic spine. (*See* DE 27-6 at 18–19 (recommending "diagnostic bilateral thoracic medial branch block at T9-10, T10-11 and T11-12"and agreeing to provide Maiden with pain treatment, including "long term opioid and non-opioid medication therapy, periodic utilization of intervention pain management techniques, and multimodal pain management therapy"); *id.* at 10 (12/9/13 progress notes requesting thoracic facet medial branch nerve neurotomies)*; see also, e.g.*, DE 27-5 at 63 (10/2/12 report of thoracic spine x-rays); DE 27-5 at 82 (11/16/12 letter noting an epidural steroid injection at T9-T10); DE 27-8 at 80 (12/13/12 letter noting a selective nerve root injection at left T10); DE 27-4 at 1 (2/20/13 physician statement noting vertebral spine aspiration); DE 27-8 at 76 (5/14/13 letter noting a bone biopsy and discussing possible surgery at T10-11); DE 27-4 at 97 (11/21/13 physician statement noting physical therapy).)

Maiden's MRIs and medical records from treating physicians showing the results of diagnostic procedures and pain assessments are the sort of "reliable, contrary evidence" that Aetna needed to consider to afford Maiden a full and fair opportunity for review. *See Love*, 574 F.3d at 397(internal citation and quotation marks omitted); *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003) ("Plan administrators, of

course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician."). Aetna's failure to say why it had disregarded such evidence or considered it but found it unpersuasive is suspect, to say the least.

And then, of course, there are Maiden's repeated claims of significant back pain made to many providers and his willingness to undergo painful procedures to diagnose and/or relieve his pain. It is not appropriate to disregard subjective evidence just because some or all of the evidence is self-reported. *See, e.g., Majeski*, 590 F.3d at 485 ("[A] plan may not deny benefits solely on the basis that the symptoms of the disability are subjective[.]") (citing *Hawkins*, 326 F.3d at 919); *see also Schwarzwaelder v. Merrill Lynch & Co.*, 606 F.Supp. 2d 546, 563 (W.D.Penn.2009) (surveying cases); *see also Pierzynski v. Liberty Life Assurance Co.*, No. 10–14369, 2012 WL 3248238, at *4 (E.D.Mich. Aug. 8, 2012) (concluding that the plan obligated the administrator "to take into account Plaintiff's subjective complaints of pain . . . something that it did not do when it chose a file review over a physical examination of Plaintiff").

Maiden made numerous trips to his regular doctor and to several specialists in apparent attempts to get relief from his pain. (*See, e.g.,* DE 27-6 at 90–93 (documenting visit to Dr. Becker, Maiden's primary care physician, in September 2012 during which reported "worsening" and "persistent" back pain); DE 27-8 at 80–82 (summarizing Maiden's visits to a neurosurgeon in November and December 2012 and reporting that Maiden visited another doctor about possible use of a spine stimulator); DE 27-8 at 75–76 (summarizing visits to a surgeon, in January and April 2013); DE 27-4 at 49–52

and DE 27-6 at 69–73, 78–82 (summarizing May, July, and August 2013 visits to Maiden's primary care physician); DE 27-6 at 52–55 (noting June and September 2013 MRIs by Dr. Fiederlein); DE 27-6 at 48-51 (summarizing September 2013 visits with a surgeon); DE 27-6 at 10–20 (documenting visits in October, November, and December 2013 with a pain management specialist).) Aetna was not required to find that Maiden's subjective evidence proved a disability, but, at a minimum, this evidence "supports an inference that his pain . . . was disabling." *Diaz v. Prud. Ins. Co.*, 499 F.3d 640, 646 (7th Cir. 2007).

Aetna argues that Maiden's "allegations of debilitating symptoms were inconsistent with the fact that he worked for many years while receiving treatment for his psychiatric and physical conditions." (DE 27 at 12.) Maiden rightly points out that Aetna failed to assert this as a reason for its denial of benefits and cannot rely on it now. *See Halpin*, 962 F.2d at 696 ("A *post hoc* attempt to furnish a rationale for denial of . . . benefits in order to avoid reversal on appeal, and thus meaningful review is not acceptable.") (internal quotation marks and citation omitted). But even if Aetna had raised this issue before, I think Maiden's long work history with this company and the continuation of his tenure after the 2009 car accident suggests he is not a shirker of work or someone inclined to malinger. In addition, the Seventh Circuit has recognized many times, there is no "logical incompatibility between working full time and being disabled from work full time. . . . A desperate person might force himself to work despite an illness that everyone agreed was totally disabling [but] might not be able to maintain

the necessary level of effort indefinitely." *Hawkins*, 326 F.3d at 918.

Moreover, here there are multiple contributing factors to the decline of Maiden's health. It could be that his back pain was no worse in September 2012 than it was before and still he was disabled because his mental health had so deteriorated that he could no longer handle a level of pain that was previously bearable.(*See* DE 27-4 at 29 (letter from Maiden's therapist, stating that "[s]ince this therapist has been working with Mr. Maiden his mental health issues have worsened to the point where he has a difficult time functioning on a daily level."); *see also* DE 27-8 at 85 (letter from a psychologist who evaluated Maiden, finding "that his physical and psychological problems had combined such that he was not able to utilize the concentration, persistence, and precision required in his job").) It could also be that Maiden's pain and psychological problems did not worsen in September 2012, but Maiden just hit his limit and couldn't do it anymore. Neither scenario would preclude Maiden from meeting the plan's definition of "disability."

### 2. *Evidence of Psychological Impairments*

Aetna's review of evidence regarding Maiden's psychological issues was also problematic. As with the physical component of Maiden's complaint, Aetna relied heavily on the opinion of its consultant, Dr. Schnur, in making its decision. (*Compare* 27-3 at 99, *with* DE 27-3 at 69 (both stating that "there were no formal measurements of cognitive and emotional functioning to indicate that the claimant was unable to perform the work of his own occupation from a psychological standpoint").) In its briefing,

Aetna argues that its decision in this regard was not arbitrary because "mental health providers should submit document testing, evaluations, mental status examinations and provide global assessment of functioning scores, and perform neurological testing." (DE 32 at 7.)

This is perplexing because the record in this case contains numerous examples of the formal measurements Aetna claims it never received. For example, The Alpine Clinic, where Maiden went for therapy as early as 2006, provided numerous global assessment of functioning scores. (DE 27-8 at 134 (GAF of 48 in June 2006); DE 27-8 at 130 (GAF of 50 in September 2008); DE 27-8 at 119 (GAF of 55 in October 2012); DE 27-4 at 4 (GAF of 45 in February 2013; GAF of 51 prior to work leave).) Dr. Akey, a psychologist, who Maiden's regular therapist asked to do a formal mental health assessment, administered a personality inventory, the MMPI-2, to Maiden in September 2012. (DE 27-5 at 62.) She also conducted a formal mental health assessment of Maiden over several sessions and reported her findings, which included several diagnoses under the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders. (*See generally* 27-7 at 72–77.)

And yet nowhere in Aetna's pre-appeal letters, Dr. Schnur's report, or Aetna's final denial letter are these measurements addressed. As with the reliable evidence of physical symptoms Maiden submitted, Aetna was not required to find these measurements demonstrate a disability, but it could not just disregard them.

### 3. *"Conflicting" Evidence*

In their briefs, defendants argue that Aetna was justified in relying on the opinions of its own consultants and disregarding those of Maiden's providers because it had a duty and a right to resolve "conflicting medical opinions" (DE 32 at 10–11 (citing *Hoffman v. Sara Lee Corp.*, 2013 WL 4804843 (N.D.Ill. Sept. 9, 2013).) But *Hoffman* is inapposite. There, the claimant for severance benefits submitted *no evidence* in support of his claim except his own conflicting accounts of events surrounding his departure from the company. *Id.* at *5–6, *10. The court understandably found the administrator was entitled to sort out the inconsistencies in the claimant's story and had a rational basis to deny benefits. *Id.* at *5–6. Here, there is no such conflict. Maiden has not given conflicting accounts about his ability to work, and neither have his providers. Aetna has cited no opinion of a treating provider indicating that Maiden could perform his job on a full time basis. To the contrary, they all seem to agree that Maiden could, at most, work part time. (*See* DE 27-4 at 11 (5/2/13 statement from Maiden's psychiatrist indicating that he could work 3–4 hours a day); DE 27-8 at 85 (5/10/13 letter from Dr. Akey, stating that his "physical and psychological problems had combined such that he was not able to utilize the concentration, persistence, and precision required in his job" and that he "could work part time . . . *if* he now believes he can sustain sufficient effort to complete his work on a reduced schedule") (emphasis added); DE 27-8 at 6 (6/3/13 letter from Dr. DeVault stating that he "is not capable of being able to adequately function in the workplace"); *see also* DE 27-4 at 1 (2/20/13 statement from Dr. Becker stating that the number of hours Maiden could work was unknown but indicating he

could do only sedentary work).)

Defendants also attempt to justify Aetna's decision by pointing to evidence in Maiden's file that Aetna asserts shows Maiden's pain is not as serious as he claims. For example, defendants claim that the finding by Maiden's physician that he could not sit or stand for long periods of time was contradicted by a neurologist's findings that were "unremarkable" and showed "normal neurological findings." (DE 32 at 14.) But a look at the records belies the argument. The cited records refer to examinations by Dr. Reibold, a neurologist, for *leg* or *hip* pain that Maiden developed in mid 2013, not back pain. (*See* DE 27-4 at 47 (noting visit for leg pain); DE 27-4 at 60 (noting pain in both the spine and the leg but stating that an MRI scan did not show the thoracic spine); DE 27-4 at 66 (noting return visit for severe pain in left leg); DE 27-5 at 1 (noting hip pain).) The specialists who examined Maiden for back pain — a neurosurgeon, a surgeon, and a pain management specialist — all agreed that Maiden had thoracic back pain and, apparently, that it was significant enough to justify powerful narcotics and painful and expensive procedures. (*See generally* discussion *supra* at 20–22.)

Similarly, defendants assert that Dr. Donaldson, a neurosurgeon, examined Maiden only once, "documented normal strength," and "did not find the condition serious enough to recommend surgery." (DE 32 at 14; *see also* DE 27 at 16.) In fact, Dr. Donaldson saw Maiden at least twice, performed several nerve root injections, and concluded that he had "persistent" back pain. (DE 27-8 at 80–81.) Her records do not expressly state why she did not "recommend surgical intervention *at this time*," but they

seem to suggest it was because the nerve root injections Maiden underwent failed to provide Maiden with any long term relief. (*Id.* (emphasis added).) Dr. Donaldson's decision not to recommend surgery may also have stemmed from her knowledge that Maiden was exploring alternative options with other specialists. (*Id.*)

One last example of Aetna's selective reading of the record is its claim that Dr. Gorup, a surgeon who examined Maiden, "reported a normal neurological exam with good hip range" and did not document any exam findings. (DE 32 at 14; *see also* DE 27 at 16.) In reality, Dr. Gorup found Maiden to suffer from thoracic stenosis, and he took Maiden's complaints of pain seriously enough to conduct a bone biopsy. (DE 27-6 at 48; DE 27-8 at 75–76.) Dr. Gorup also found Maiden to be a candidate for spinal surgery. (DE 27-8 at 75–76.)

These are not the only instances of cherry-picking by Aetna; the defendants' briefs, the reports of Aetna's consultants, and Aetna's denial letters are replete with them. Such a selective reading of Maiden's record is unjustified and fell short of what was required of Aetna. *See Majeski,* 590 F.3d at 483–84 (holding that denial was arbitrary where insurer selectively relied on pieces of evidence to support denial of benefits, while context demonstrated disability); *Leger v. Tribune Co. Long Term Disability Benefit Plan*, 557 F.3d 823, 833 (7th Cir. 2009) (finding denial arbitrary where insurer cherry-picked statements from claimant's medical history to support the decision, but ignored significant other supporting her claim of disability); *see also Glenn v. Metro. Life Ins. Co.*, 461 F.3d 660, 672–73 (6th Cir.2006) (holding denial was arbitrary where the plan

selectively considered evidence to reach a decision unsupported by the record as a whole), *aff'd* 554 U.S. 105 (2008).

In summary, the problems in Aetna's review of Maiden's evidence—inexplicably disregarding the opinions of treating physicians and ignoring evidence supporting disability while cherry-picking evidence to support a denial—lend an unmistakable hue of capriciousness to Aetna's review. When you add to the pile the fact that Aetna used consultants with an incentive to affirm and itself had a structural conflict of interest and would have to pay Maiden any LTD benefits awarded, it's clear that Aetna abused its discretion, and Maiden must be given another opportunity to prove his claim. *See Holmstrom*, 615 F.3d at 777 ("A structural conflict is one factor among many that are relevant in the abuse-of-discretion analysis . . and will act as a tiebreaker when the other factors are closely balanced.") (citation and quotation omitted).

### *LWOP Benefits*

Aetna asserts that Maiden may not argue the denial of LWOP benefits was an abuse of discretion because he did not raise it in his opening summary judgment brief (DE 32 at 17.) This assertion is odd as Maiden's motion and his brief make clear that he intended to address Aetna's denials of both his LTD claim and his LWOP claim. *(See, e.g.*, DE 28 at 5, 8; DE 29 at 5, 8.) Lumping the two claims together makes sense here, where even Aetna admits that its LWOP denial was based in significant measure on Aetna's finding that Maiden could perform his own job during Aetna's review of the LTD claim—a finding I have now determined to have been arbitrary and capricious.

(*See* DE 27 at 23.) Though Aetna's final denial of LWOP benefits states that Maiden's evidence did not show he could not work at another job or occupation, it is clear that this determination was entirely derivative of Aetna's finding that Maiden could do his own job during the LTD review. (*See id.* ("Aetna reasonably explained that because Plaintiff was not disabled form his own job, he was also not disabled from any reasonable job, thus it was upholding its denial of his LWOP claim."); *see also* DE 27-9 at 31–33 (nurse review including no discussion of the LWOP policy's "any reasonable job or occupation" prong).) Accordingly, Aetna's review of Maiden's LWOP claim was arbitrary and capricious, and the denial of the claim was an abuse of discretion.

### Appropriate Remedy

Maiden asks me to award a retroactive payment of benefits plus interest instead of remanding the case to Aetna. (DE 28 at 13; DE 33 at 18–19.) Reinstatement of benefits usually is reserved for "claimants who were receiving disability benefits, and but for their employers' arbitrary and capricious conduct, would have continued to receive benefits, or . . . situations where there is no evidence in the record to support a termination or denial of benefits." *Quinn v. Blue Cross & Blue Shield Ass'n*, 161 F.3d 472, 477 (7th Cir. 1998) (citation omitted). Where, like here, the claimant was not receiving benefits and the administrator failed "to make adequate findings or . . . to provide an adequate reasoning, the proper remedy . . . is to remand for further findings or explanations, unless it is so clear cut that it would be unreasonable for the plan administrator to deny the application for benefits on any ground." *Id.* at 477 (quoting

*Gallo v. Amoco Corp.*, 102 F.3d 918, 923 (7th Cir. 1996) (internal quotation marks omitted). This is not such a case. Maiden may find himself unable to perfect the claim, even with more specific information about what Aetna needs to see and even after Aetna considers the compound effect of his physical and psychological impairments. Accordingly, the case must be remanded to Aetna for further review and reconsideration.

## CONCLUSION

For these reasons, Maiden's Motion for Summary Judgment (DE 28) is **GRANTED**, and Defendants' Motions for Summary Judgment and to Dismiss (DE 26) are **DENIED**. This case is **REMANDED** to Aetna for further proceedings consistent with this judgment.

**SO ORDERED.**

**ENTERED:** January 6, 2016

s/ Philip P. Simon
CHIEF JUDGE
UNITED STATES DISTRICT COURT